[No. 25954-1-II. Division Two. February 1, 2002.]

WASHINGTON INDEPENDENT TELEPHONE ASSOCIATION, ET AL., *Appellants*, v. THE WASHINGTON UTILITIES AND TRANSPORTATION COMMISSION, *Respondent*.

---

[18] In addition to the plea offer sheets.

*Timothy J. O'Connell* and *Kendall J. Fisher* (of *Stoel Rives, L.L.P.*), for appellants.

*Christine O. Gregoire, Attorney General*, and *Mary M. Tennyson, Senior Assistant*, for respondent.

QUINN-BRINTNALL, J. — This case involves the challenge of Verizon Northwest, Inc. (formerly known as GTE North-

west Incorporated), to the enactment of a Washington Utilities and Transportation Commission (WUTC) rule limiting access fees. The rule requires the access fees one phone company charges another for the use of its local network to be set at the actual cost of the service (not to exceed the lowest rate charged for comparable local interconnection service). Verizon argues that this action was "ratemaking," and thus beyond the WUTC's statutory authority in a rule-making proceeding. We agree that WUTC exceeded its statutory authority by enacting WAC 480-120--540. Therefore, we reverse and declare WAC 480-120-540 invalid.

FACTS

THE ACCESS CHARGE REFORM RULE, WAC 480-120-540

The rule at issue, WAC 480-120-540,[1] limits the rates local phone companies can charge long distance companies for the use of local networks at the terminating end of long-distance calls.

The rule requires that "the rates charged by a local exchange company for terminating access shall not exceed the lowest rate charged by the local exchange company for the comparable local interconnection service (in each exchange)." WAC 480-120-540(1). If a local exchange company (LEC) does not provide local interconnection service, the rates it charges for terminating access cannot exceed the actual cost of the terminating access service being provided. WAC 480-120-540(1). This actual cost "shall be determined based on the total service long-run incremental cost [TSLRIC] of terminating access service plus a reasonable contribution to common or overhead costs." WAC 480-120--540(2).

In other words, if an LEC does not provide local interconnection service (so that it can set its terminating access

---

[1] The order adopting WAC 480-120-540 is found generally at Clerk's Papers 46-72 (from Docket No. UT-970325), and is referenced herein as General Order No. R-450. See appendix for the full text of the rule.

charges in parity with it), it shall set its access charges at its TSLRIC (total service long-run incremental cost) plus overhead. Thus, WAC 480-120-540 attempts to put the terminating access charges (which the callee's LEC charges the long distance carrier or inter-exchange carrier (IXC)) "in parity with" local interconnection service (which the callee's LEC charges the caller's LEC). Subsection (2) furthers the WUTC's goal of "identifying cost-based terminating charges in parity with local interconnection service." Clerk's Papers at 51.

Telephone companies lose revenue under the new rule. The rule provides three methods that allow the LECs to offset any revenues lost due to the lowering of their terminating access charges. These are (a) to recoup losses by increasing originating access charges (WAC 480-120--540(6)), (b) to add an additional rate element designated as a "universal service rate element" (WAC 480-120-540(3)), or (c) to raise other rates (besides originating access charges), subject to WUTC review. *See* General Order No. R-450, at 12-13.[2] The WUTC claims these methods render the rule "revenue neutral" and thus its action is not rate setting.

PROCEDURAL HISTORY

The WUTC adopted General Order No. R-450 on September 23, 1998, with an effective date of December 20, 1998. On November 9, 1998, all of the LECs registered in Washington and several competitive LECs filed a petition for review in Thurston County Superior Court. A simultaneous motion for supersedeas under RCW 80.04.180, or in the alternative, for a stay, was denied on November 18, 1998. Petitioners argued the merits of the case to Judge W. Thomas McPhee on November 19, 1999. Judge McPhee took the matter under advisement and issued a written opinion affirming the WUTC on April 18, 2000. Washington

---

[2] The third alternative is not found in the rule itself, but rather in the General Order, explaining that the companies can always do an earnings review. *See* General Order No. R-450, at 13.

Independent Telephone Ass'n (WITA), and Verizon, but not US West, timely filed this appeal.[3]

We address two questions: (1) does WAC 480-120-540 set telephone company rates and (2) if so, is the WUTC authorized to set rates by rule?

ANALYSIS

ADOPTION OF THE RULE

The rule-making action began in 1997 in response to a petition filed by AT&T Communications of the Pacific Northwest, Inc., requesting an investigation into the cost of universal service and to reform intrastate carrier access charges.

The WUTC enacted WAC 480-120-540 under General Order No. R-450 in 1998. That document gives the following "CONCISE STATEMENT OF PURPOSE AND EFFECT OF THE RULE":

> The rule conforms Washington's telecommunications access charge system with state and federal laws encouraging competition. The rule will convert a pricing structure that retards competition to one designed to support emerging competition without favoring any class of participants. Ultimately this will enable greater customer choice throughout the state of Washington.

Clerk's Papers at 46.

The rule itself limits the rate an LEC may charge an IXC:

> [T]he rates charged by a local exchange company for terminating access shall not exceed the lowest rate charged by the local exchange company for the comparable local interconnection service (in each exchange), such as end office switching or tandem switching. If a local exchange company does not provide local interconnection service . . . the rates charged for terminating access shall not exceed the cost of the terminating access service being provided.

WAC 480-120-540(1).

---

[3] The WITA companies subsequently withdrew their appeal on September 22, 2000.

■ On review of the rule, the superior court held that the rule did not set telephone rates, stating

> the Access Reform Rule is a policy of general applicability to establish a standard that will govern rate setting between the Commission and individual telecommunication companies. The rule does not set rates; and its adoption does not exceed the Commission's authority.
>
> . . . .
>
> No expansion of the specifically delegated power of the Commission to make rates (RCW 80.01.040(3), 80.04.110-.140 and 80.36.110.-140) is required for it to enact rules containing standards to be applied *to future rates* and rate adjudications.

Clerk's Papers at 17 (emphasis added). We disagree. Once filed and approved, a tariff has the full force and effect of law. *Gen. Tel. Co. of the N.W, Inc. v. City of Bothell*, 105 Wn.2d 579, 585, 716 P.2d 879 (1986). The Access Charge Rule requires telecommunications companies to change the terminating access component of their filed, presumptively valid rates.

■ In general, the WUTC argues that the rule is not self-executing because it does not "set rates," but rather "set[s] a standard against which tariffed rates will be judged." Br. of Resp't at 22. It argues that the tariffs on file at the time of the rule's enactment continued to govern the companies' rates, and if a company's terminating access rates were already in compliance with the new rule, the company would not have to file a new tariff pursuant to the rule. But in the order adopting the rule, the WUTC admitted that it was "prescribing a rate design that will require most, if not all, companies, to file revisions to their approved tariffs in order to have tariffs on file that comply with the rule." Clerk's Papers at 65.

We see no difference between the WUTC enacting a rule that affirmatively lowers utilities' rates and a rule that effectively renders currently filed rates unlawful or out of compliance. The companies are forced to change their

tariffs or be out of compliance with the rule and subject to civil and criminal penalties. *See* RCW 80.04.380, .385.[4]

WUTC then argues that the rule is not rate setting because it provides three methods of offsetting the loss of revenue the rule causes: (1) recoup losses by increasing originating access charges; (2) add an additional rate element designated as a universal service rate element; or (3) raise other rates, subject to WUTC review. WAC 480-120--540; General Order No. R-450, at 12-13. And the WUTC claims that the companies are not limited to the three options in WAC 480-120-540. According to WUTC, all the rule demands is that the companies set their terminating access rates at parity with their rate for local interconnection or at their TSLRIC cost. Beyond this, "the Rule grants the companies almost unlimited discretion on how it can structure its rates. . . . the rule does not limit a company's creativity in designing its rates." Br. of Resp't at 38.

But WUTC's argument proves too much. WUTC acknowledges that the rule limits the rate a company may charge for terminating access service. But it argues that because companies might find alternative ways to make up the impact of the revenue loss, the rule does not set a rate. We disagree.

The fact that a company may be able to mitigate or offset the loss of revenue from reduced terminating access service charges does not alter the fact that the rule sets the

---

[4] The WUTC claims that if a company that needs to make a new filing under the rule fails to do so, the WUTC cannot order automatic rate reductions, but it must remedy this noncompliance in a hearing at which it (the WUTC) would have the burden of proving the company's rates were unlawful. Verizon disagrees, arguing that any company out of compliance with the new rule would be subject to civil and criminal penalties; therefore, the companies had no choice but to comply with the terms of the rule. Br. of Appellant at 10 (citing RCW 80.04.380 (establishing monetary penalty for any public service officer/company that violates or fails to comply with any provision of Title 80 RCW or any order of the Commission) and RCW 80.04.385 (providing that the above is also a gross misdemeanor)). If a company's filed rates did not comply with the rule's requirements regarding terminating access charges, the company was obligated to come into compliance by 60 days or risk a hearing at which it faced civil or criminal penalties. (Rule takes effect 60 days after publishing, allowing the utility companies 30 days to prepare and file compliance tariffs and the WUTC 30 days to review the new tariffs.)

maximum rate the company may charge for terminating access service.

WAC 480-120-540 is rate making. The rule sets the rate a company may charge for terminating access service.

POWER TO SET TELECOMMUNICATIONS RATES BY RULE

We now turn to whether the WUTC had the authority to set rates by rule.

■■■ We review the validity of a rule promulgated by an agency under RCW 34.05.570. *Wash. Indep. Tel. Ass'n v. Telecomm. Ratepayers Ass'n for Cost-Based & Equitable Rates*, 75 Wn. App. 356, 362, 880 P.2d 50 (1994) (*TRACER*). The extent of an agency's rule-making authority is a question of law that this court reviews de novo. *Local 2916, IAFF v. Pub. Employment Relations Comm'n*, 128 Wn.2d 375, 379, 907 P.2d 1204 (1995); *Armstrong v. State*, 91 Wn. App. 530, 536, 958 P.2d 1010 (1998) (holding Department of Fish and Wildlife had authority to enact regulation requiring hunters to wear bright orange vests), *review denied*, 137 Wn.2d 1011 (1999). An agency possesses only those powers granted by statute. *In re Registration of Elec. Lightwave, Inc.*, 123 Wn.2d 530, 536, 869 P.2d 1045 (1994). When reviewing an agency rule, the reviewing court shall declare the rule invalid if it finds that the rule exceeds the agency's statutory authority. RCW 34.05.570(2)(c); *TRACER*, 75 Wn. App. at 362.

The party asserting a regulation's invalidity bears the burden of proving that the action was invalid. RCW 34.05.570(1)(a); *Armstrong*, 91 Wn. App. at 536. A rule is invalid if it (1) violates constitutional provisions; (2) exceeds the agency's statutory authority; (3) was adopted without compliance to statutory rule-making procedures; or (4) is arbitrary and capricious in that it could not have been the product of a rational decision maker. RCW 34.05.570(2)(c); *Neah Bay Chamber of Commerce v. Dep't of Fisheries*, 119 Wn.2d 464, 469, 832 P.2d 1310 (1992). In this case, Verizon asserts that WAC 480-120-540 exceeds the WUTC's statutory authority because it sets rates, a function the WUTC cannot achieve by rule making.

 Construction of a statute is a question of law that we review de novo under the error of law standard. *Waste Mgmt. of Seattle, Inc. v. Utils. & Transp. Comm'n,* 123 Wn.2d 621, 627, 869 P.2d 1034 (1994). The courts retain the ultimate authority to interpret statutes. *Waste Mgmt. of Seattle,* 123 Wn.2d at 627; *Franklin County Sheriff's Office v. Sellers,* 97 Wn.2d 317, 325-26, 646 P.2d 113 (1982), *cert. denied,* 459 U.S. 1106 (1983). Whether an agency's construction of a statute is accorded deference depends on whether the statute is ambiguous, and where an agency is charged with the administration and enforcement of a statute, the agency's interpretation of an ambiguous statute is accorded great weight in determining legislative intent. *Waste Mgmt. of Seattle,* 123 Wn.2d at 628 (citing *City of Pasco v. Pub. Employment Relations Comm'n,* 119 Wn.2d 504, 507, 833 P.2d 381 (1992)). Absent ambiguity, however, there is no need for the agency's expertise in construing the statute. *Pasco,* 119 Wn.2d at 507. And we will not defer to an agency determination that conflicts with the statute. *Waste Mgmt. of Seattle,* 123 Wn.2d at 628.

Utility rates are set by tariff and must be fair, just, reasonable, and sufficient. RCW 80.36.080. *See also* ch. 480-80 WAC. Telecommunications companies must file their tariffs with the WUTC and keep them accessible to the public. RCW 80.36.100. Once a utility's tariff is filed and approved, it has the force and effect of law. *Gen. Tel. Co. of the N.W.,* 105 Wn.2d at 585. Rates may be changed in two ways, depending on who (the company itself, or the WUTC or a third party) initiates the change.

If a telecommunications company wishes to raise its rates, it must give the WUTC 30 days' notice and publish the proposed change. RCW 80.36.110. The notice must plainly state the changes proposed and when the new rate will go into effect. RCW 80.36.110. The proposed changes must themselves be published (just like the original rates).[5] RCW 80.36.110. The WUTC may challenge the rate in-

---

[5] A company may lower its rates as well, of course; the procedure for doing so is not relevant here. *See* RCW 80.36.110(2).

crease during the 30-day notice period (on its own motion or on the complaint of a third party), and the increase will be adjudged at a hearing. RCW 80.04.130(1). At this hearing, the telecommunications company bears the burden of proving the increase is just and reasonable. RCW 80.04.130(2).

The WUTC may change a company's rates on its own motion or on the complaint of a third party if it finds after a hearing that the rates are improper:

> Whenever the commission shall find, after a *hearing* . . . that the rates, charges, tolls or rentals . . . charged or collected by any telecommunications company . . . are unjust, unreasonable, unjustly discriminatory or unduly preferential, or in anywise in violation of law, or that such rates . . . are insufficient to yield reasonable compensation for the service rendered, the commission shall determine the just and reasonable rates . . . to be thereafter observed and in force, and fix the same by *order* as provided in this title.

RCW 80.36.140 (emphasis added).[6] Verizon argues that before reducing the rate a company may charge for service, the WUTC must hold a hearing into the propriety of the company's rates. RCW 80.36.140.

The second paragraph of RCW 80.36.140 addresses the allowed methods to change the rules, regulations, and practices of telecommunication companies:

> Whenever the commission shall find, after such hearing that *the rules, regulations or practices* of any telecommunications company are unjust or unreasonable, or that the equipment, facilities or service of any telecommunications company is inadequate, inefficient, improper or insufficient, the commission shall determine the just, reasonable, proper, adequate and efficient rules, regulations, practices, equipment, facilities and service to be thereafter installed, observed and used, and fix the same by order *or rule* as provided in this title.

(Emphasis added.)

---

[6] *See also* RCW 80.04.110 (establishing general procedure, applicable to all public utility commissions, to challenge the lawfulness of their utilities' practices, including lawfulness of rates).

Verizon asserts that the italicized language of this paragraph bolsters its position because that paragraph allows the WUTC (after a hearing) to fix a utility company's rules, regulations, or practices by order *or rule*, but not its rates. Verizon cites the well-established rule of statutory construction that, when the legislature uses certain language in one part of a statute and different language in another, we presume the legislative intent to be different in the two instances. *See State ex rel. Pub. Disclosure Comm'n v. Rains*, 87 Wn.2d 626, 634, 555 P.2d 1368 (1976) (citing *State v. Roth*, 78 Wn.2d 711, 715, 479 P.2d 55 (1971)).

Paragraph one of RCW 80.36.140 addresses *"rates, charges, tolls or rentals"* and requires the agency to conduct a hearing before altering them and requires that rates be changed by order. Paragraph two governs the scope of the agency's rule-making authority and addresses rules, regulations, practices, equipment, facilities, and services, not "rates." It also requires a hearing, but then it provides that the agency may take action by order *or rule*.

The WUTC argues that the legislature authorized rate setting by rule in two sections of the Administrative Procedures Act, chapter 34.05 RCW. The first generally requires a "statement of inquiry" for rule making, but it makes an exception for (inter alia) " '[r]ules that set or adjust fees or rates pursuant to legislative standards.' " *See* Br. of Resp't at 28 (quoting RCW 34.05.310(4)(f)). The second statute describes certain "significant legislative rules" that require additional determinations made about them, but excludes rules that set or adjust fees or rates pursuant to legislative standards. *See* Br. of Resp't at 29 (citing RCW 34.05.328(5)(b)(vi)). The WUTC argues that this language about rates in the rule-making statutes proves that it may set rates by rule because "[i]f ratemaking, as a matter of law, may not be done by rule, then these provisions exempting ratemaking from some rulemaking procedures would be superfluous." Br. of Resp't at 29.

We agree that statutes must not be construed in a manner that renders any portion of them meaningless or

superfluous. *Stone v. Chelan County Sheriff's Dep't*, 110 Wn.2d 806, 810, 756 P.2d 736 (1988). That basic tenet notwithstanding, agencies may exercise only those powers conferred on them " 'either expressly or by necessary implication.' " *TRACER*, 75 Wn. App. at 363 (quoting *Human Rights Comm'n v. Cheney Sch. Dist. No. 30*, 97 Wn.2d 118, 125, 641 P.2d 163 (1982)). Our decision today does not render RCW 34.05.310(4)(f) or RCW 34.05.328(5)(b)(vi) superfluous. We do not hold today that rate making, as a matter of law, may not be done by rule. Rather, we hold that under the authority the legislature granted to WUTC, that agency cannot set telecommunications rates by rule.

The statutes in chapter 34.05 RCW are of general applicability, while the statutes in chapter 80.36 RCW pertain specifically to telecommunications, including the WUTC. Another basic rule of statutory construction provides that where one statutory provision deals with a subject in a general way and another deals with the same subject in a specific way, the specific prevails. *State v. Murphy*, 98 Wn. App. 42, 48, 988 P.2d 1018 (1999), *review denied*, 140 Wn.2d 1018 (2000). Therefore, as to the authority of the WUTC, the general statutes in chapter 34.05 RCW give way to the agency-specific language of the statutes in chapter 80.36 RCW.

The WUTC claims that it not only was permitted to enact the changes to the terminating access charges in a rule, but that it was constrained to do so. The trial court also cited *Simpson Tacoma Kraft Co. v. Department of Ecology*, 119 Wn.2d 640, 835 P.2d 1030 (1992), to support its holding that the rule is "a policy of general applicability to establish a standard that will govern rate setting between the Commission and individual telecommunication companies." Clerk's Papers at 17. In support of its assertion that it was required to promulgate a rule in order to address access rates, the WUTC quotes the following:

"Because Ecology applies its numeric standard uniformly to the entire class of entities which discharges dioxin into the state's waters, we conclude that this standard is 'of general applica-

bility' within the meaning of RCW 34.05.010(15).[7] Ecology's numeric standard thus constitutes a 'rule' under the APA."

Br. of Resp't at 26 (quoting *Simpson Tacoma Kraft*, 119 Wn.2d at 648).

The above quote from *Simpson Tacoma Kraft* may explain why the rule-making procedure makes sense when establishing general policy. But the issue in that case was not whether the agency (the Department of Ecology) had the power to act by rule but, rather, whether its actions amounted to a rule even though the agency claimed it was not a rule. *See Simpson Tacoma Kraft*, 119 Wn.2d at 647-49. Here, neither side contends that WUTC's action was not rule making. But they disagree about whether the WUTC had the power to take the rate action it did in a rule-making proceeding.

From a policy standpoint, the more logical course to avoid piecemeal compliance among the telecommunication companies might be to accomplish WUTC's goals by rule instead of adjudication. But the WUTC lacked the authority to limit terminating access rates by rule. An agency may not go beyond its legislative grant, even when doing so is more logical or more convenient: "If an enabling statute does not authorize either expressly or by necessary implication a particular regulation, that regulation must be declared invalid despite its practical necessity or appropriateness." *TRACER*, 75 Wn. App. at 363.

We hold that the WUTC cannot change a telecommunications company's lawful established rates by rule.

The WUTC asserts that it has "no choice about whether to allow competition in the telecommunications industry; it must do so" under the Telecommunications Act of 1996 and RCW 80.36.300-.375, which "mandate[s] a shift away from regulated monopolies to reliance on competitive markets." Br. of Resp't at 4. While we do not hold to the contrary, we observe that the WUTC misses the point: Neither authority

---

[7] WUTC clarifies in a footnote here that the applicable subsection in RCW 34.05.010 is now (16), with no change in language.

referenced above altered the statutory requirement that the WUTC may reduce existing, lawfully filed tariffs only by order after a hearing and a finding that the rate is unjust. RCW 80.36.140.[8]

We hold that (1) WAC 480-120-540 set rates, and (2) the WUTC had no authority to set rates by rule. The rule is, therefore, invalid.

Because we hold that the WUTC lacked authority to enact WAC 480-120-540, the Access Reform Rule, we do not address whether the rule is arbitrary and capricious.

We declare WAC 480-120-540 invalid and reverse the judgment of the superior court.

ARMSTRONG, C.J., and HOUGHTON, J., concur.

## APPENDIX

**480-120-540 Terminating access charges.** (1) Except for any universal service rate allowed pursuant to subsection (3) of this section, the rates charged by a local exchange company for terminating access shall not exceed the lowest rate charged by the local exchange company for the comparable local interconnection service (in each exchange), such as end office switching or tandem switching. If a local exchange company does not provide local interconnection service (or does so under a bill and keep arrangement), the rates charged for terminating access shall not exceed the cost of the terminating access service being provided.

(2) The cost of the terminating access shall be determined based on the total service long-run incremental cost of terminating access service plus a reasonable contribution to common or overhead costs. Local loop costs are considered "shared" or "joint" costs and shall not be included in the cost of terminating

---

[8] The WUTC also claims that RCW 80.04.160, 80.36.080, and 80.01.040 bestow the necessary authority on the WUTC to enact the Access Reform Rule. A careful review of each statute shows that none gives WUTC power to make or reduce rates. The closest any of these comes to bestowing such a power is section (4) of RCW 80.01.040, which grants the WUTC the power to "[m]ake such rules and regulations as may be necessary to carry out its other powers and duties." But this general grant cannot supercede the specific statutes that address how a telecommunications company's rates may be changed.

access. However, nothing in this rule prohibits recovery of local loop costs through originating access charges (including switched, special, and dedicated as defined in subsection (4)(a) of this section).

(3) If a local exchange company is authorized by the commission to recover any costs for support of universal access to basic telecommunications service through access charges, it shall recover such costs as an additional, explicit universal service rate element applied to terminating access service.

(4) Definitions.

(a) "Access charge" means a rate charged by a local exchange carrier to an interexchange carrier for the origination, transport, or termination of a call to or from a customer of the local exchange carrier. Such origination, transport, and termination may be accomplished either through switched access service or through special or dedicated access service.

(b) "Terminating access service" includes transport only to the extent that the transport service is bundled to the end office or tandem switching service. Dedicated transport unbundled from switching services is not subject to subsection (1) of this section.

(c) "Bill and keep" (also known as "mutual traffic exchange" or "payment in kind") is a compensation mechanism where traffic is exchanged among companies on a reciprocal basis. Each company terminates the traffic originating from other companies in exchange for the right to terminate its traffic on that company's network.

(5) The requirement of subsection (1) of this section that any terminating rate be based on cost shall not apply to any local exchange company that is a small business, or to any local exchange company that is competitively classified, if it concurs in the terminating rate of any local exchange company that has filed a terminating rate that complies with the requirements of subsection (1) of this section. For the purposes of this subsection, "small business" has the same meaning as it does in RCW 19.85.020.

(6) Any local exchange company that is required to lower its terminating access rates to comply with this rule may file tariffs or price lists (as appropriate) to increase or restructure its originating access charges. The commission will approve the

revision as long as it is consistent with this rule, in the public interest and the net effect is not an increase in revenues.

WAC 480-120-540.

Review granted at 147 Wn.2d 1002 (2002).