64 P.3d 606 (2003)
148 Wash.2d 887
WASHINGTON INDEPENDENT TELEPHONE ASSOCIATION, a Washington nonprofit corporation; Asotin Telephone Company, a Washington corporation; Centurytel of Washington, a Washington corporation; Centurytel of Inter-Island, a Washington corporation; Centurytel of Cowiche, a Washington corporation; Ellensburg Telephone Company, a Washington corporation; GTE Northwest Incorporated, a Washington corporation; Hat Island Telephone Company, a Washington corporation; Hood Canal Telephone Company, Inc., a Washington corporation; Inland Telephone Company, a Washington corporation; Kalama Telephone Company, a Washington corporation; Lewis River Telephone Company, a Washington corporation; Marshell Telecom, Inc., a Washington corporation; McDaniel Telephone Company, a Washington corporation; Pend Oreille Telephone Company, a Washington corporation; Pioneer Telephone Company, a Washington corporation; Rainier Cable, Inc., a Washington corporation; St. John Cooperative Telephone And Telegraph Company, a Washington corporation; Tenino Telephone Company, a Washington corporation; The Toledo Telephone Company, Inc., a Washington corporation; US West Communications, Inc., a Washington corporation; Western Wahkiakum County Telephone Company, a Washington corporation; Whidbey Telephone Company, a Washington corporation; and Yelm Telephone Company, a Washington corporation, Respondents,
v.
WASHINGTON UTILITIES AND TRANSPORTATION COMMISSION, Petitioner.
No. 72330-3.
Supreme Court of Washington, En Banc.
Argued November 19, 2002.
Decided March 6, 2003.
*607 Christine Gregoire, Attorney General, Mary Tenneson, Gregory Trautman, Assistant Attorneys General, for Petitioner.
Stoel, Rives, Timothy O'Connell, Kendall Fisher, Seattle, for Respondents.
Richard Finnigan, Olympia, Amicus Curiae on Behalf of Washington Independent Telephone Assn.
MADSEN, J.
The Washington Utilities and Transportation Commission (Commission) challenges a *608 Court of Appeals decision that invalidated WAC 480-120-540. The Court of Appeals concluded that the Commission set certain rates for telecommunications companies in the rule rather than by adjudication, and thus acted in excess of its authority. The Commission contends that rather than setting rates, WAC 480-120-540 establishes a methodology that must be used in rate setting. We agree. We also agree with the Commission that the rule is not arbitrary and capricious. We reverse the Court of Appeals.

Facts
Generally, local telecommunications companies (local exchange carriers or LECs) provide local access to telephone service. Long distance carriers (interexchange carriers or IXCs) provide only part of the network necessary to complete a long distance call and rely on the local networks of local exchange carriers to originate and terminate the calls. When a long distance call is made, the caller, usually, pays the long distance carrier for the call. The long distance carrier pays the local exchange carriers' originating and terminating access charges for use of the local exchange networks.[1]
The rule at issue, WAC 480-120-540, concerns terminating access charges and requires that these charges not exceed the rate charged for comparable local connection service, or, if the local carrier does not provide local connection service, the company cannot charge more as terminating access charges than the cost of providing the service. WAC 480-120-540(1).
The Commission explains that WAC 480-120-540 was adopted as part of its efforts to implement procompetitive policies of the state telecommunications act of 1985, Laws of 1985, ch. 450, and the federal Telecommunications Act of 1996, 47 U.S.C. § 151 (1996) (hereafter 1996 Act). Each of these acts represents changing policy regarding regulation of telecommunications companies, i.e., movement in the direction of competition.[2] The United States Supreme Court has explained that the Federal Communications Commission (FCC) has rule-making authority to carry out provisions of the Communications Act of 1934, which include the local competition provisions added by the Telecommunications Act of 1996. AT & T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). The Court said that "[t]he [1996 Act] fundamentally restructures local telephone markets. States may no longer enforce laws that impede competition, and incumbent LECs are subject to a host of duties intended to facilitate market entry." AT & T, 525 U.S. at 371, 119 S.Ct. 721.
Against the background of the state and federal acts, the Commission promulgated WAC 480-120-540.[3] WAC 480-120-540 applies to both incumbent local exchange carriers and competitive local exchange carriers not used.[4] The rule is designed to carry out *609 state and federal policy to promote competition in the local telecommunications market by addressing one of several reforms sought under the federal 1996 Act, i.e., access charge reform.[5] As the United States Supreme Court explained in Verizon Communications, Inc. v. F.C.C., 535 U.S. 467, 122 S.Ct. 1646, 1662, 152 L.Ed.2d 701 (2002):
It is easy to see why a company that owns a local exchange ... would have an almost insurmountable competitive advantage not only in routing calls within the exchange, but, through its control of this local market, in the markets for terminal equipment and long-distance calling as well.... The incumbent company ... could place conditions or fees (called "access charges") on long-distance carriers seeking to connect with its network. In an unregulated world, another telecommunications carrier would be forced to comply with these conditions, or it could never reach the customers of a local exchange.
(Citation omitted.)
Incumbent companies thus had a competitive advantage over potential competitors because they could, through terminating access charges, increase revenue from other companies and lower rates charged to their own customers. The local exchange carrier was, in effect, able to export costs of service for its local customerswith these costs ultimately being paid by the customers of other companies, i.e., the customers of interexchange carriers who pay the long distance charges.
This practice was not unlawful, and indeed the Commission approved it. A telecommunications company's rates must be "fair, just, reasonable and sufficient." RCW 80.36.080. When a telecommunications company files with the Commission a tariff (a schedule of rates and services), as required by RCW 80.36.100, and if the Commission does not act, the tariff becomes effective 30 days after filing, RCW 80.36.110(1), and has the force and effect of state law. Gen. Tel. Co. of N.W. v. City of Bothell, 105 Wash.2d 579, 585, 716 P.2d 879 (1986). The Commission has authority, however, to suspend any new tariff within 30 days of filing, hold a hearing to consider the proposed change, and prescribe a different rate if it concludes that the change is unjust, unfair, or unreasonable. RCW 80.36.110, .140. Thus, existing terminating access charges, although anticompetitive, were valid and had the force and effect of law (provided they were not suspended and undergoing investigation).[6]
Moreover, it is both state and federal policy that telecommunications service be provided in all areas at affordable and comparable rates, i.e., that universal service be provided. This policy had been effected by "implicit subsidies" to high cost areas through rate averaging and through revenues from access charges that offset losses in local rates. Thus, while serving as barriers to competition, access charges also served to subsidize universal service.
In adopting WAC 480-120-540, the Commission said that its purpose is to "convert a pricing structure that retards competition to one designed to support emerging competition without favoring any class of participants. Ultimately this will enable greater customer choice throughout the state of Washington." Wash. Utils. & Transp. Comm'n, General Order No. R-450, Order Adopting Rules Permanently, In the Matter of Adopting WAC 480-120-540 Relating to Intrastate Carrier Access Charge Reform, Docket No. UT-970325 (Oct. 5, 1998) (hereafter Order R-450) at 1; Clerk's Papers (CP) at 46.
There is no dispute that the rule can and probably will result in a reduction of revenue derived from terminating access charges. The Commission noted: *610 Companies such as U S WEST Communications, GTE Northwest, PTI Communications (now CenturyTel) today provide local services to nearly all business and residential customers. Their rates are regulated by the Commission and must be fair, just, reasonable, and sufficient. A decrease in access charges will result in either a decrease in their overall profits (which must remain "sufficient") or an offsetting increase in other rates, or some combination of the two.
Order R-450 at 4; CP at 49. The rule contains alternatives intended to permit a company to offset losses in terminating access revenueso that it is possible that the net effect of the rule may be revenue neutral. If a local exchange carrier employs the alternatives set out in the rule, the Commission has determined that it will permit the change without critical review. The first is that a local exchange company, if "authorized by the commission to recover any costs for support of universal access to basic telecommunications service through access charges[,]... shall recover such costs as an additional, explicit universal service rate element applied to terminating access service." WAC 480-120-540(3). This option is designed to allow a company to replace any implicit subsidy for universal service that was previously obtained through terminating access charges with an explicit rate for universal service.[7] The second option is that a local exchange company that is required under the rule to lower terminating access rates may file tariffs or price lists to increase or restructure originating access charges. WAC 480-120-540(6).[8] In addition to these alternatives in the rule, a company can revise other rates, subject to the possibility of Commission review in a general rate case. See Order R-450, at 13; CP at 58.
WAC 480-120-540 was set to be effective on December 30, 1998. On November 9, 1998, numerous telecommunications companies filed a petition for review in Thurston County Superior Court. The merits of the case were argued November 19, 1999, with the companies contending that the Commission had exceeded its authority by requiring changes in rates by rule rather than by adjudication, and arguing that the rule is arbitrary and capricious. Judge McPhee issued a written opinion April 18, 2000, upholding the rule and denying the petition.[9] Several parties appealed, but only Verizon Northwest Inc. (formerly GTE Northwest, Inc.) remained as an appellant. The Court of Appeals reversed, holding that the rule sets rates. That court also held that the Commission acted in excess of its authority when it adopted the rule because rates can *611 be set only by adjudication, and the rule is therefore invalid. Wash. Indep. Tel. Ass'n v. Wash. Utils. & Transp. Comm'n, 110 Wash. App. 147, 39 P.3d 342, review granted, 147 Wash.2d 1002, 53 P.3d 1007 (2002) (hereafter WITA). Given its disposition of these questions, the Court of Appeals did not reach the issue whether the rule is arbitrary and capricious. We granted the Commission's petition for discretionary review.

Analysis
WAC 480-120-540 provides, in part:
(1) Except for any universal service rate allowed pursuant to subsection (3) of this section, the rates charged by a local exchange company for terminating access shall not exceed the lowest rate charged by the local exchange company for the comparable local interconnection service (in each exchange), such as end office switching or tandem switching. If a local exchange company does not provide local interconnection service (or does so under a bill and keep arrangement), the rates charged for terminating access shall not exceed the cost of the terminating access service being provided.
(2) The cost of terminating access shall be determined based on the total service long-run incremental cost [TSLRIC] of terminating access service plus a reasonable contribution to common or overhead costs.
. . . .
(4) Definitions.
(a) "Access charge" means a rate charged by a local exchange carrier to an interexchange carrier for the origination, transport, or termination of a call to or from a customer of the local exchange carrier....
The superior court held that the rule did not set rates, reasoning that it instead is a policy of general applicability that establishes a standard governing rate-setting between the Commission and individual telecommunications companies. The Court of Appeals disagreed, reasoning that since a company's filed tariffs have the full force and effect of state law, and the rule requires companies to change the terminating access component of those presumptively valid rates, the rule sets rates. WITA, 110 Wash.App. at 153, 39 P.3d 342. The court saw "no difference between the [Commission] enacting a rule that affirmatively lowers utilities' rates and a rule that effectively renders currently filed rates unlawful or out of compliance." Id. The court noted that companies are subject to civil and criminal penalties if they are out of compliance with the rule. WITA, 110 Wash.App. at 153-54, 39 P.3d 342 (citing RCW 80.04.380,.385). The court also concluded that the methods for offsetting loss of terminating access charge revenue do not alter the result; the alternatives for making up lost revenue do "not alter the fact that the rule sets the maximum rate the company may charge for terminating access service." WITA, 110 Wash.App. at 154-55, 39 P.3d 342.
The Commission maintains the Court of Appeals erred by holding that the rule sets rates. The Commission points out that the rule does not determine or set rates for any individual company, and it does not determine whether the particular rates of any company meet the criteria set forth in the rule. Verizon contends, to the contrary, that the Court of Appeals' holding is supported by the Commission's admission that the rate design "will require most, if not all, companies to file revisions to their approved tariffs in order to have tariffs on file that comply with the Rule." Order R-450, at 20. Amicus Curiae Washington Independent Telephone Association[10] characterizes WAC 480-120-540 as capping terminating access charges, and reasons that the rule is therefore a new requirement that changes the basis for calculating each company's rates. Verizon and amicus also point out the potential for penalties for noncompliance, which compel a company to file a new tariff in accord with the rule.
Contrary to the Court of Appeals decision, and the arguments of Verizon and amicus, the rule does not set rates but only describes a methodology for rate-setting. *612 Without doubt it will require many, if not all, local exchange companies to file new tariffs. However, there is a difference between actual ratemaking and a rule that may lead to rate-making. As this court has observed, rate-making decisions have often been highly technical, involving a determination of revenue allowed to the utility that historically has been determined by adding operating expenses to the rate base multiplied by the allowed rate of return. US West Communications, Inc. v. Wash. Utils. & Transp. Comm'n, 134 Wash.2d 48, 54, 949 P.2d 1321 (1997); People's Org. for Wash. Energy Res. v. Wash. Utils. & Transp. Comm'n, 104 Wash.2d 798, 808-09, 711 P.2d 319 (1985). Such rate-making decisions are very factual, involving a particular company's circumstances.[11]
The United States Supreme Court's recent decision in AT & T, while not involving exactly the same issue as is involved here, is persuasive authority that WAC 480-120-540 does not set rates. Among other things, the companies and state commissions in that case challenged a pricing rule promulgated by the FCC that required that prices for interconnection and unbundled access[12] be based on "`Total Element Long Run Incremental Cost' (TELRIC)a forward-looking rather than historic measure" of cost. AT & T, 525 U.S. at 374, 119 S.Ct. 721. The petitioners maintained that the rule was invalid because the 1996 Act provided that "a State commission shall ... establish any rates for interconnection...." 47 U.S.C. § 252(c)(2). They thus argued that the FCC was setting interconnection rates, which it was not authorized to do by the 1996 Act. (They also maintained that under TELRIC costing their historic costs were "stranded" and actual costs of providing interconnection and unbundled access were underestimated. AT & T, 525 U.S. at 375 n. 3, 119 S.Ct. 721.)
The Court rejected the claim that the FCC had engaged in unauthorized rate-setting, holding that
[t]he FCC's prescription, through rulemaking, of a requisite pricing methodology no more prevents the States from establishing rates than do the statutory "Pricing standards" set forth in § 252(d). It is the States that will apply those standards and implement that methodology, determining the concrete result in particular circumstances. That is enough to constitute the establishment of rates.

AT & T, 525 U.S. at 384, 119 S.Ct. 721 (emphasis added); see also Verizon, 535 U.S. 467, 122 S.Ct. 1646, 152 L.Ed.2d 701 (upholding the FCC's establishment of the particular methodology, TELRIC, set out in the rule). Pursuant to the federal 1996 Act and RCW 80.36.610, the Commission must set just and reasonable wholesale rates that incumbent local exchange companies must charge to their competitors for access to their unbundled network elements, and must do so using the TELRIC rate-making methodology established by the FCC.
Like the federal rule at issue in AT & T and Verizon, WAC 480-120-540 establishes a methodology for rate-making. The FCC's rule requires that rates for interconnection must be based upon the TELRIC costing methodology; the rule did not constitute rate-making but instead established a methodology for determining rates. WAC 480-120-540 requires that terminating access charges cannot exceed the rate charged for comparable local connection service or actual costs based upon the TSLRIC costing methodology, *613 plus reasonable common or overhead costs. Like the federal rule, the state rule does not determine the "concrete" result in a given case, and does not, as the Commission points out, result in any dollar and cents rate for any company.
We hold that WAC 480-120-540 does not set rates, as the superior court correctly determined. Instead it establishes a methodology that must be used in setting rates.
The Commission clearly has authority under Title 80 RCW to establish a rate-making methodology by rule. The Commission's Order R-450 relies on RCW 80.01.040, RCW 80.04.160, and RCW 80.36.140 as authority for WAC 480-120-540. RCW 80.01.040(1), (3), and (4) authorize the Commission to "[e]xercise all the powers and perform all the duties prescribed" by Title 80 and to regulate in the public interest the rates and services of telecommunications companies, and to "[m]ake such rules and regulations as may be necessary to carry out its other powers and duties." RCW 80.01.040(1); .040(4). RCW 80.04.160 provides that the Commission is authorized to "adopt, promulgate and issue rules and regulations covering the transmission and delivery of messages and conversations... and any and all services concerning the same, or connected therewith...." These statutes establish the Commission's broad rule-making authority where regulation of telecommunications companies is concerned.
RCW 80.36.140 is the statute which Verizon relies on for the proposition that rates cannot be set by rule. Since we conclude the rule does not in fact set rates, we do not address all the arguments involving whether RCW 80.36.140 prohibits rate-setting by rule. We do note, however, that RCW 80.36.140 states in part that
[w]henever the commission shall find, after a hearing had upon its own motion or upon complaint, ... that the rules, regulations, or practices of any telecommunications company affecting ... rates ... are unjust, unreasonable, unjustly discriminatory or unduly preferential, or in anywise in violation of law, ... the commission shall determine the just and reasonable rates... and fix the same by order as provided in this title.
This part of the first paragraph of RCW 80.36.140 raises the question whether WAC 480-120-540 is aimed at company practices affecting rates within the meaning of the statute. We find it is not. The Commission did not proceed on the basis that any particular company's practices affecting rates were unjust, unreasonable, discriminatory, preferential or in violation of law. Indeed, as noted, the Commission had, under these same standards, approved tariffs that included the existing terminating access charges. Instead, the purpose for promulgation of the rule was to further the procompetition goals of the state telecommunications act of 1985 and the federal 1996 Act by setting an industry-wide standard that limits terminating access charges. Moreover, the Commission did not set rates at all, as we have said, and thus clearly did not set rates in response to any company practices. Thus, the quoted portion of RCW 80.36.140 does not prohibit the Commission's adoption of WAC 480-120-540.
Next, we briefly comment on the state Administrative Procedure Act (APA), chapter 34.05 RCW, in the context of this case. The Commission at times appears to argue that rule-making is appropriate under the APA, and therefore WAC 480-120-540 is valid regardless of provisions in Title 80 RCW. The provisions of the APA do not trump a specific state statute respecting an agency's authority, however. An agency has only the authority granted by statute. In re Elec. Lightwave, Inc., 123 Wash.2d 530, 537, 869 P.2d 1045 (1994). Nevertheless, we determine that the Commission not only had authority under Title 80 to promulgate WAC 480-120-540, but rule-making was also appropriate under the APA.
The APA defines a rule as including "any agency order, directive, or regulation of general applicability (a) the violation of which subjects a person to a penalty or administrative sanction...." RCW 34.05.010(16). WAC 480-120-540 meets this definition of a rule. This court has, in a number of cases, held that where an agency's order, directive or regulation of general applicability meets the definition of a rule, the agency must go through rule-making. E.g., Hillis v. Dep't of Ecology, 131 Wash.2d 373, 397-400, 932 *614 P.2d 139 (1997) (agency's policies and procedures regarding which water applications would be given priority, use of a watershed assessment process for purposes of making decisions on applications, and ranking of watersheds for assessments had to be adopted through rule-making); Failor's Pharmacy v. Dep't of Soc. & Health Servs., 125 Wash.2d 488, 494-96, 886 P.2d 147 (1994) (agency changes to rate schedules for Medicaid reimbursement constituted reimbursement methodology that had to be adopted through rule-making); Simpson Tacoma Kraft Co. v. Dep't of Ecology, 119 Wash.2d 640, 835 P.2d 1030 (1992) (Ecology's standard for discharge of dioxin invalid because the agency did not engage in rule-making; standard was uniformly applied to the entire class of entities discharging dioxins into state waters).
The APA's rule-making procedures include providing notice to the public of the proposed rule and an opportunity to comment, thus ensuring that members of the public can meaningfully participate in the development of rules pertaining to them. Hillis, 131 Wash.2d at 399, 932 P.2d 139; Simpson Tacoma, 119 Wash.2d at 648-49, 835 P.2d 1030. Here, the rule-making process involved all the affected telecommunications companies who had ample opportunity to comment on the proposed rule; the agency record is approximately 5000 pages. Moreover, rule-making assures that generally applicable standards are applied uniformly. Here, WAC 480-120-540 applies uniformly to all local exchange carriers' terminating access charges.
Thus, in addition to comporting with the Commission's delegated authority under Title 80 RCW, WAC 480-120-540 also comports with the APA regarding rulemaking and this court's observation in McGee Guest Home, Inc. v. Department of Social & Health Services, 142 Wash.2d 316, 322, 12 P.3d 144 (2000) that the court has "been vigilant in insisting that administrative agencies treat policies of general applicability as rules and comply with necessary APA procedures."
Verizon next argues that, even if the Commission acted within its authority in promulgating WAC 480-120-540, the rule is an arbitrary and capricious exercise of that authority. Contrary to the telecommunications companies' arguments, the superior court held that WAC 480-120-540 is not arbitrary and capricious. The Court of Appeals did not reach this issue because it invalidated the rule on other grounds. We address the issue here rather than remand to the Court of Appeals. See RAP 13.7(b).
The burden of proving that a rule is invalid is on the party asserting the invalidity. RCW 34.05.570(1)(a). A rule will be declared invalid if it is arbitrary and capricious. RCW 34.05.570(2)(c).
Verizon and the Commission frame their arguments about whether WAC 480-120-540 is arbitrary and capricious in terms of the analysis set out in Neah Bay Chamber of Commerce v. Department of Fisheries, 119 Wash.2d 464, 832 P.2d 1310 (1992). The superior court applied Neah Bay. Neah Bay involved a prior version of RCW 34.05.570(2)(c) that stated that a reviewing court could invalidate a rule upon a determination that the rule "`could not conceivably have been the product of a rational decision-maker.'" Neah Bay, 119 Wash.2d at 469, 832 P.2d 1310 (quoting RCW 34.05.570(2)(c)). The court in Neah Bay reasoned that this language was analogous to the arbitrary and capricious standard, and adopted a multifactor inquiry to use in deciding whether a rule could not conceivably have been the product of a rational decision-maker.[13] In 1995, the legislature changed the statutory language to "arbitrary and capricious." Laws of 1995, *615 ch. 403, § 802(2)(c). In Manor v. Nestle Food Co., 131 Wash.2d 439, 447, 932 P.2d 628; 945 P.2d 1119 (1997) this court said that when the legislature changed the language in 1995 to "arbitrary and capricious" it acquiesced in the interpretation in Neah Bay. Thus, the court in Manor continued to use the analysis from Neah Bay.
However, more recently the court has not, under the newer "arbitrary and capricious" version of RCW 34.05.570(2)(c), applied the multifactor test used in Neah Bay. Instead, we used the more familiar formulation of the test for determining whether actions are arbitrary and capricious, i.e., agency action is arbitrary and capricious if it is willful and unreasoning and taken without regard to the attending facts or circumstances. Rios v. Dep't of Labor & Indus., 145 Wash.2d 483, 501, 39 P.3d 961 (2002); see Hillis, 131 Wash.2d at 383, 932 P.2d 139 (in connection with agency action alleged to be arbitrary and capricious). "`[W]here there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous.'" Rios, 145 Wash.2d at 501, 39 P.3d 961 (quoting Hillis, 131 Wash.2d at 383, 932 P.2d 139). This examination of agency action is consistent with the APA's requirement that "[i]n reviewing matters within agency discretion, the court shall limit its function to assuring that the agency has exercised its discretion in accordance with law, and shall not itself undertake to exercise the discretion that the legislature has placed in the agency." RCW 34.05.574(1).
At the same time, the court has also recently reverted to the Neah Bay analysis when assessing the validity of an agency rule. Hoffman v. Regence Blue Shield, 140 Wash.2d 121, 126, 991 P.2d 77 (2000) (quoting Manor, 131 Wash.2d at 454, 932 P.2d 628).
While we continue to recognize that the analysis under the old APA standard and the new "arbitrary and capricious" standard are far more similar than dissimilar, our uneven application of the two approaches is likely to have caused some confusion and perhaps consternation among agencies and those challenging agency rules. Accordingly, it is time to clarify the standard of review. When the legislature changed to an arbitrary and capricious standard for invalidating an agency rule (among other bases), it did not merely acquiesce in our interpretation in Neah Bay. Had that been the case, the legislature would have done nothing at all and the Neah Bay interpretation would simply have continued to apply.[14] Instead, as we noted in Rios, the legislature "substituted" the "arbitrary and capricious" standard. Rios, 145 Wash.2d at 501 n. 12, 39 P.3d 961. We are convinced that by this substitution the legislature intended that the usual "arbitrary and capricious" analysis should be applied, as in Rios. Moreover, while in Neah Bay the court acknowledged that the older standard was analogous to the arbitrary and capricious standard, Neah Bay, 119 Wash.2d at 473, 832 P.2d 1310; it did not state they were identical.
We conclude that the arbitrary and capricious standard, as set forth in Rios and Hillis, should be applied.[15] To repeat, agency action is arbitrary and capricious if it is willful and unreasoning and taken without regard to the attending facts or circumstances. Rios, 145 Wash.2d at 501, 39 P.3d 961. "`[W]here there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous.'" Id. (quoting Hillis, 131 Wash.2d at 383, 932 P.2d 139). This means that Neah Bay's specific three-part test for whether a rule could not conceivably have been the product of a rational decision-maker under former RCW 34.05.570(2)(c) (1988) is, generally speaking, unnecessary. Of course, if a *616 rule was promulgated at the time when the former version of the statute was in effect, that former version of the statute applies in assessing the validity of the rule. See RCW 34.05.902.[16]
Other principles noted in Neah Bay continue to apply, however, as the APA continues to contain most of the same provisions existing at the time the case was decided. Thus, under RCW 34.05.562(1) and RCW 34.05.570(1)(b), the validity of a rule is determined as of the time the agency took the action adopting the rule. The agency must keep a rule-making file, which serves as the record for review, though it is not necessarily the exclusive basis for agency action on the rule. RCW 34.05.370(1), (4). The file must contain a concise explanation of the rule, identifying the agency's reasons for adopting the rule. RCW 34.05.325. Therefore, when a rule is challenged as arbitrary and capricious, the reviewing court must consider the relevant portions of the rule-making file and the agency's explanations for adopting the rule as part of its review in order to determine whether the agency's action was willful and unreasoning and taken without regard to the attending facts or circumstances.
Verizon first contends that suggested alternatives for making up terminating access charge revenue lost because of the rule are arbitrary and capricious. Verizon maintains that the alternative of increasing originating access charges cannot make up lost revenues because originating access charges are susceptible to competition among the local exchange companies. Verizon argues that local exchange companies will thereby be priced out of the market, despite the fact that incumbent local exchange carriers continue to be fully regulated. Verizon also contends that universal service costs will become an even more disproportionate burden as a result of the rule. In effect, Verizon argues that the impact of the rule will be competition that will cause a loss in revenues.
The superior court correctly determined that WAC 480-120-540 is not arbitrary and capricious on this basis. First, Verizon points to nothing in the record that factually supports its claim. Nevertheless, the Commission agrees that if competition develops, companies may in time lose revenue because of customer choices. If that happens, however, it would be a logical result of state and federal procompetition legislation. Moreover, telecommunications companies are entitled by law to sufficient revenue, and if a company believes it is not receiving sufficient revenue, it can request adjustment to tariffed rates. In addition, the rule's provisions for shifting revenue to an express universal service component of terminating access fees and to originating access fees are not the only alternatives available to the companies. As the Commission states, WAC 480-120-540 does not limit a company's creativity in designing its rates, provided that it complies with the terminating access charge maximum established by the rule. As to potential losses due to "rate lag," the superior court noted that "the consequence that the telecommunications companies may incur significant costs in pursuing a new rate setting is not an arbitrary and capricious consequence when measured against the expressed legislative goal of increased competition in this business." CP at 21. We agree.
Verizon also contends that the rule is arbitrary and capricious because the Commission has mandated reliance on unreliable universal service cost determinations. Order R-450, at 24 notes the rule's provision for explicit recovery of universal service costs, and states that such costs have not been determined for some companies. CP at 69. The order says that the Commission is investigating costs of universal service in Docket UT-980311(a), and that some companies *617 might want to wait for results of that investigation before making major changes in terminating and originating access revenues. Order R 450, at 24. Subject to listed conditions, the order states, "the Commission would accept an interim compliance leaving existing terminating access charges in place." Id. However, Verizon points out, the Commission subsequently concluded that estimates in Docket UT-980311(a) were not reliable enough to be used to determine universal service costs, but nevertheless concluded in a footnote in an order regarding that docket that the estimates were sufficient for use in the access charge rule. When telecommunications companies sought clarification, the Commission withdrew the footnote. As the Commission adds, though, it did not require any companies to use the universal service costs determined in Docket UT-980311(a); a company could instead submit that it had greater costs and support its submission with a cost study. Moreover, the Commission says, although Docket UT-980311(a), Tenth Supplemental Order said that the estimates were not reliable enough for purposes of assessing amounts to be placed into a universal service fund, the same order said that for purposes of the order the cost estimates were a reasonable estimate of the costs of U.S. West, GTE, and Sprint/United of providing service in the exchanges these companies operate in Washington.
Contrary to Verizon's contention, the rule does not mandate reliance on discredited estimates, nor does it even address universal cost estimates. Moreover, at the time the rule was promulgated, the universal cost estimates were under investigation; the rule at the time it was adopted clearly did not involve consideration of any unreliable estimates. As the superior court reasoned, the series of events recounted by Verizon is not central to enactment of the rule. We hold that the superior court appropriately concluded that the rule is not arbitrary and capricious on the basis that the adoption order allowed the optional use of universal costs estimates determined in Docket UT-980311(a).
Moreover, the Commission's conclusion that the cost estimates were a reasonable estimate of costs of U.S. WEST, GTE, and Sprint/United of providing service in the exchanges these companies operate in Washington appears in the same order relied on by Verizon as showing the estimates were unreliable. This also undercuts Verizon's claim, even if the events postdating the rule's adoption are considered (additional evidence of the agency's reasoning and background materials may be presented on review only insofar as relevant to explain the agency's decision at the time it was made, Neah Bay, 119 Wash.2d at 474-75, 832 P.2d 1310).
Finally, Verizon contends that the rule is arbitrary and capricious because WAC 480-120-540(2) provides that
[t]he cost of the terminating access shall be determined based on the total service long-run incremental cost of terminating access service plus a reasonable contribution to common or overhead costs. Local loop costs are considered "shared" or "joint" costs and shall not be included in the cost of terminating access.

(Emphasis added.) Verizon contends that the rule's exclusion of loop costs from the costs of providing terminating access is inconsistent with the Commission's prior orders and is irrational, arbitrary and capricious. Verizon contends that when a toll call terminates, the call necessarily has to transverse the local loop on the receiving end, and that asserting "that the cost of providing terminating access service includes no component allocable to the local loop is simply contrary to reality" and "defies logic." Br. of Verizon at 37.
The superior court's ruling on this claim is well reasoned, and we quote it here:
[The Commission] has not changed the definition of shared costs, but rather has made a policy decision about how those shared costs should be allocated. In order to encourage competition, the rule permits the shared cost of access service to be recovered from the originating access charge billed to the LEC's customer, but prohibits that cost from being recovered as part of terminating access charged to an IXE [IXC] and passed through to a consumer other than the LEC's customer. Such a decision may be illogical in the view *618 of the telecommunications companies, and may ultimately prove incorrect, but it is not arbitrary and capricious. The aim of encouraging competition by this policy is entirely plausible and is consistent with the legislature's directive.
CP at 21.
We note that Order R-450 shows the Commission's reasoning and its response to various concerns raised during the rule-making proceedings. As noted, the administrative record is approximately 5,000 pages, and, as the superior court stated, "shows an evolutionary process whose final result is the rule at issue." CP at 22. The telecommunications companies had a full opportunity to present their views, and it is obvious that the Commission considered them.
We hold that Verizon has not established that WAC 480-120-540 is arbitrary and capricious, and accordingly we affirm the superior court's ruling.[17]

Conclusion
WAC 480-120-540 establishes a methodology that must be used in setting rates for telecommunications companies' terminating access charges. It does not, however, actually set rates. Therefore, the Commission did not exceed its authority when promulgating the rule, and the rule is not invalid as in excess of agency authority. Accordingly, the Court of Appeals' holding that the rule sets rates and is therefore invalid is reversed, and the superior court's ruling is affirmed.
Verizon has not satisfied its burden of demonstrating the rule is arbitrary and capricious, and we therefore uphold the superior court's determination that the rule is not arbitrary and capricious.
The Court of Appeals is reversed, and the superior court's decision denying Verizon's petition for review is reinstated.
ALEXANDER, C.J., JOHNSON, SANDERS, IRELAND, BRIDGE, CHAMBERS, OWENS, JJ., THOMPSON, J. Pro Tem., concur.
NOTES
[1] Some of the larger local exchange carriers also provide toll service, and thus pay access charges. Accordingly, they have some common interest with the interexchange carriers. See Wash. Utils. & Transp. Comm'n General Order No. R-450, Order Adopting Rules Permanently, In the Matter of Adopting WAC 480-120-540 Relating to Intrastate Carrier Access Charge Reform, Docket No. UT-970325 (Oct. 5, 1998) (hereafter Order R-450) at 4; Clerk's Papers (CP) at 46.
[2] Historically, telecommunications companies have been regulated monopolies. States generally granted exclusive franchises to local exchange carriers, which owned local loops, the switches, and the transport trunks that constitute a local exchange network. AT & T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). "[I]n order to offset monopoly power and ensure affordable, stable public access to a utility's goods or services, legislatures enacted rate schedules to fix the prices a utility could charge." Verizon Communications, Inc. v. F.C.C., 535 U.S. 467, 122 S.Ct. 1646, 1655, 152 L.Ed.2d 701 (2002). In this state, the legislature delegated rate-making power to the Commission, which is obliged to assure fair prices and service to customers, as well as sufficient earnings to the utilities so they can remain in business. People's Org. for Wash. Energy Res. v. Wash. Utils. & Transp. Comm'n, 104 Wash.2d 798, 808, 711 P.2d 319 (1985).
[3] There is no claim in this case that the Commission failed to follow proper rule-making procedures.
[4] The state telecommunications act of 1985 provides for classification of some telecommunications companies as competitive companies, subject to minimal regulation. RCW 80.36.310 (Laws of 1985, ch. 450, §§ 3, 4).
[5] Others are the implementation of the Act's obligations of competitors to interconnect with each other, see, e.g., AT & T, 525 U.S. at 371, 119 S.Ct. 721 (foremost among the duties the 1996 Act places on local exchange companies is the obligation to share its network with competitors), and universal service.
[6] The Commission found that access charges paid by the interexchange carriers (and ultimately these long distance carriers' customers) amount to almost 20 percent of total telephone retail revenues in Washington. See Order R-450, at 4.
[7] The Commission explained in Order R-450, at 14 that the extent to which terminating access charges may include an implicit subsidy for universal service was not at issue during the rule-making leading to adoption of WAC 480-120-540. Universal service was being addressed under a separate docket number, and the option provided in WAC 480-120-540(3) was a "mitigation approach to allow companies to bifurcate the existing terminating access rates into two elements: (a) a cost-based or interconnection-based terminating rate, and (b) a residual temporary universal service increment." Order R-450, at 14; CP at 59. The Commission explained that this permitted the local exchange "companies to hold their total terminating access rates at current levels pending resolution of universal service issues." Id. The Commission added that once issues relating to universal service were addressed, any subsidy necessary for each individual company should be known, and the "interim (residual) temporary universal service increment will be eliminated and replaced with a Commission-authorized increment (consistent with subsection 3) of [WAC 480-120-540]). The Commission-authorized increment may be more than or less than the temporary interim residual increment allowed prior to the Commission's decision regarding the cost of universal service." Order R-450, at 14; CP at 59.
[8] The Commission explained that

[t]he shift to originating access charges without a critical review is supported because the same class of customers, namely IXC's [interexchange carriers], pay access charges (both originating and terminating), and IXC's will continue to pay access charges. This adjustment to the rate design within access charges will be revenue neutral in the aggregate and will allow both the local and toll markets to become more competitive. Competition does not always result in a loss of revenue. Revenues will be a function of satisfying customer demand rather than monopolizing a bottleneck service.
Order R-450, at 13; CP at 58.
[9] Judge McPhee found that claims of unconstitutionality were insufficiently established. No claim regarding constitutionality of the rule was raised on appeal or on this discretionary review.
[10] Amicus was a party to the superior court proceedings and appealed that court's decision. However, it withdrew its appeal. Its motion to file an amicus brief in this court was granted.
[11] See 1 A.J.G. PRIEST, PRINCIPLES OF PUBLIC UTILITY REGULATION 45 (1969), which explains:

The orthodox making of public utility rates requires four basic determinations: (1) what are the enterprise's gross utility revenues under the rate structure examined; (2) what are its operating expenses, including maintenance, depreciation and all taxes, appropriately incurred to produce those gross revenues; (3) what utility property provides the service for which rates are charged and thus represents the base (rate base) on which a return should be earned and (4) what percentage figure (rate of return) should be applied to the rate base in order to establish the return (wages of capital) to which investors in the utility enterprise are reasonably entitled.
[12] "Unbundling" refers to making separately available what previously was offered as a single comprehensive service, for example, phone service. It does not refer to physically separating components of the service, but instead refers to giving separate prices for equipment and supporting services. See AT & T, 525 U.S. at 394, 119 S.Ct. 721.
[13] The test was stated:

The court's task is to determine if a given regulation is reasonable without substituting this court's judgment for that of the agency. First, the court inquires if the agency's explanation of its own rule is clear. Second, the court must ask if the agency utilized the appropriate statutory framework, whether it used correct factors in deciding the rule, and if it avoided improper factors. Third, the court must decide if a decision-maker could have reached the conclusion reached by the agency (taking the foregoing into account) by some reasonable process.
Neah Bay Chamber of Commerce v. Dep't of Fisheries, 119 Wash.2d 464, 473-74, 832 P.2d 1310 (1992).
[14] The rule of statutory construction involving legislative acquiescence is that "[t]he Legislature is deemed to acquiesce in the interpretation of the court if no change is made for a substantial time after the decision." State v. Coe, 109 Wash.2d 832, 846, 750 P.2d 208 (1988) (emphasis added); see also Baker v. Leonard, 120 Wash.2d 538, 545, 843 P.2d 1050 (1993) ("[l]egislative silence regarding the construed portion of the statute in a subsequent amendment creates a presumption of acquiescence in that construction" (emphasis added)).
[15] To the extent our decision in Manor and Hoffman are inconsistent, they are disapproved.
[16] Unfortunately, the court failed to note that because the rule at issue in Manor v. Nestle Food Co., 131 Wash.2d 439, 932 P.2d 628; 945 P.2d 1119 (1997), was promulgated in 1983, id. at 445, 932 P.2d 628, under RCW 34.05.902 it was not subject to either the "could not conceivably have been the product of a rational decision-maker" standard or the "arbitrary and capricious" standard. RCW 34.05.570(2)(c) In contrast, in Aviation West Corp. v. Department of Labor & Industries, 138 Wash.2d 413, 435-36, 980 P.2d 701 (1999), the court recognized that the 1988 version of RCW 34.05.570(2)(c) applied because it was in effect at the time the rule at issue was adopted.
[17] Verizon also claims that via the rule the Commission has manipulated the burden of proof as to whether rates are lawful. Verizon appears to argue this is an independent basis for invalidating the rule. This proposition is doubtful. When a utility files revised tariffs establishing new rates, the utility bears the burden of proof if the Commission holds a hearing on the rates. RCW 80.04.130. If the Commission or a third party challenges existing rates as unjust or unreasonable, the Commission or third party bears the burden of proof. RCW 80.04.110. Thus, if, in order to comply with the rule, a company files a new tariff that is suspended and a hearing is held, the company will bear the burden of proof. However, if the rule's alternatives are employed, the Commission has determined rate changes will not undergo critical review. Moreover, if a company were to do nothing, the Commission would need to file a complaint and would bear the burden of proof.

It is unclear why any of these circumstances would invalidate the rule. More importantly, Verizon cites no authority justifying a conclusion that the rule is invalid for burden-shifting reasons, and we reject the argument for this reason.